COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-05-328-CV

 

 

WESTERN
RESERVE LIFE                                                    APPELLANTS

ASSURANCE
COMPANY OF OHIO, 

INTERSECURITIES,
INC., AND 

TIMOTHY HUTTON                                                                              

 

                                                   V.

 

DAVID
GRABEN AND                                                           APPELLEES

FRANK STRICKLER                                                                               

 

                                              ------------

 

              FROM
THE 271ST DISTRICT COURT OF WISE COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

I.  INTRODUCTION








In three issues, Appellants
Western Reserve Life Assurance Company of Ohio (AWRL@),
Intersecurities, Inc. (AISI@), and Timothy Hutton (together, Athe Brokers@),[1]
assert (1) that the trial court made errors of law when awarding damages, (2)
that the evidence is neither legally nor factually sufficient to support the
jury=s findings of liability and damages-enhancing conduct, and (3) that
the trial court committed procedural and evidentiary errors in charging the
jury.  We affirm in part, reverse and
render in part, and reverse and remand in part.   

II.  FACTUAL AND PROCEDURAL BACKGROUND

This is the case of the
spiritual advisor turned investment advisor. 
ISI is a financial investment company that has 2,400 registered
representatives nationwide, including Hutton, an ISI agent.  Appellees David Graben and Frank Strickler were
two of Hutton=s clients.

A.     Timothy Hutton








Hutton had previously been a
pastor.  When he turned forty, he decided
that he wanted a career change; he wanted to do something that would allow him
to Abless people.@  Hutton claimed the financial investment
business provided him Athe
opportunity to be a blessing to others.@  Even after he became a
financial advisor, he remained a part-time preacher and retained the Aprivilege . . . [of performing] marriage ceremonies and funerals for
some of my clients.@  Hutton had no college degree and no formal
education in financial management; none of Hutton=s seventy college hours related to financial management.

B.     David Graben

David Graben flew for American
Airlines for almost thirty-four years until March 1997, when he retired from
American Airlines at the age of sixty. 
Graben elected to receive his American Airlines retirement in the form
of a cash settlement, which he then placed into an IRA that was managed by his
financial advisor at the time, Joe Marshall. 
In 1999, Graben became dissatisfied with Marshall and approached Hutton
about moving his investments to Hutton=s firm.

Prior to becoming a client of
Hutton, Graben met twice with Hutton and told Hutton that he wanted to preserve
his principal.  Hutton assured Graben
that the principal would be protected. 
Graben testified, A[a]nd I told
him, I want to make the maximum amount of money you can safely make, but don=t ever lose the principal, and they laughed.  And they said, oh, lose the principal, of
course not.  We would not lose your
principal.@  Graben also told Hutton that he wanted his
investment to provide a monthly income off which he would live. Graben
indicated that his long-range plans included leaving his investments to his
grandchildren. 








During their meetings, they
further discussed Graben=s financial
goals and options for Graben=s assets of approximately $2.5 million.  Graben wished to maximize his return and
minimize his risk.  Although Graben
testified that preserving his principal was important to him, he also
understood that investing in the market carried a risk, that he could lose
money, and that Hutton had no crystal ball that would allow Graben to be in the
market on upswings and out of it in downturns. 
Hutton responded to this information by telling Graben that he should
move his investment to Hutton so that Hutton could move Graben back Atowards the more safe side.@  Graben specifically testified
that he relied on what Hutton and Hutton=s partner, Al Demicell, had told him.








In his investment application
form, Graben ranked his investment objectives with Along-term growth@ first, Aincome@ second, and
Ashort-term growth@ third.  Although Asafety of principal@ was a choice, he did not place it among his top three goals.  Based on Graben=s criteria, Hutton recommended a WRL variable annuity, in which the
assets are invested in a group of subaccounts that function like mutual
funds.  Hutton asserted that one of the
unique features of a variable annuity was its ability, through its death
benefit, to marry Graben=s goal of
receiving potential market growth with protection against market
downturns.  This benefit purported to
lock in the highest value reached by the account on an anniversary of the policy
issuance, less withdrawals.  Thus, the
death benefit guaranteed that Graben=s family would receive the highest value the account reached,
including net gains, even if the value had declined at the time of his death.  This was supposed to mean that the principal
initially invested, less the insured=s withdrawals of principal, was preserved for his estate, along with
investment gains in the account.

Although Hutton was a Acommissioned broker@Cwhich meant that Hutton=s compensation was based on an initial commission paid by the insurance
companyCwhen he sold Graben the variable annuity, he also undertook to monitor
Graben=s investments and give financial advice.  These services are not required of a
commissioned broker, but Hutton assumed the role of Graben=s Afinancial
advisor,@ even though he did not ask to be paid a fee for his services as is
customary with a fee-based financial advisor. 
Hutton testified, AI said as a
commissioned broker from a technical standpoint, I do not have that
responsibility.  But I also said that as
a decent individual, and as an honorable person, I have gone beyond that, and I
have provided investment advice to them, and acted as a financial advisor.@








Hutton described how he
monitored the investments= subaccounts
by referring to leading independent sources such as Morningstar ratings,
reviewing the quarterly statements, insisting on only the highest-rated funds,
advising Graben to make allocation changes as needed, and consulting with
Graben.  In selecting funds, Hutton
looked at several criteria, including the experience level of the fund
managers, the volatility or risk level of the funds, and the funds= performances.  Financial documents,
telephone logs, and the testimony of Hutton=s partner, Demicell, confirmed that Hutton took the above steps before
selecting funds.

From 1999 to early 2000, the
stock market and Graben=s
investments did well, and Graben was happy with Hutton.  In March 2000, however, Graben=s investments began declining with the market.  In addition to the market decline, Graben
also made withdrawals from his investments account. Hutton and Graben spoke
about the decline, and Graben suggested moving his money into cash.  Hutton counseled against such a move, as it
would Alock in the losses,@ and advised Graben to ride out the rough period.  Hutton had explained to Graben how the market
was cyclical and had a chart in his office tracking the history of the market,
which he used with clients to illustrate the market trends.  Graben could have directed Hutton to move his
investments out of the market, but instead he took Hutton=s advice and remained in the market.

On October 21, 2001, Hutton
sent Graben a letter stating that he had invested in a new computer system Ato help me do a better job of what you ultimately pay me to do:  Monitor your investments and keep you posted
on any changes or recommendations to your financial plan.@  Graben presented this letter
at trial to support his complaint of misrepresentation.








Following the September 11
terrorist attacks, Graben=s
investments continued to slide with the market. 
Graben=s
investments, though losing money, actually performed better than the market
benchmarks, the S&P 500, and the NASDAQ Fund and also performed better over
this period than if he had remained in his prior investments with
Marshall.  By 2003, the stock market
began rebounding.  In September 2003,
Graben moved his investments to another financial advisor, Michelle Brennan
Hall, but by the time of trialCover a year and a half laterCHall had not made substantive changes to Hutton=s allocation of Graben=s investments.  As of December
2004, Graben=s
investments had regained their losses and showed a net gain of $143,317. Based
on a $2.5 million original investment, this gain represented a 5.7% return over
five years, or about 1% per year.

Although Graben was not happy
that his retirement investments lost considerable value while he was a client
of Hutton and had questioned Hutton whether there was a way to Astop the loss,@ he
understood that AMr. Hutton
did not have anything to do with the downturn of the economy.@  He also did not believe that
Hutton was dishonest.

C.     Frank Strickler








Frank Strickler was also an
American Airlines pilot, retiring in September 1997 when he turned sixty.  Strickler also elected to take a lump sum
settlement at the time of retirement and then placed his American Airlines
retirement funds into an IRA managed by Marshall,  whom Strickler found to be very difficult to
access because Marshall had many clients and was very busy.  Graben thereafter referred Hutton to
Strickler.  Hutton and Demicell contacted
Strickler and then met with him to discuss how they could help him manage his
IRA.  Hutton and Demicell informed
Strickler that their firm, Demicell & Hutton, was small, that the firm
hand-picked its clients, and that they provided extraordinary personal
attention and personal advice for those hand-picked clients.  Strickler specifically informed Hutton that
Strickler=s goal was
to preserve the principal of his retirement benefits, to have the principal
earn income to support his modest lifestyle, and to be able to leave his
principal to his wife.  After Hutton and
Demicell met with Strickler in March 2000, Strickler decided to invest through
Hutton.  Strickler already had three
variable annuities with other companies, all of which he transferred to Hutton.  He also purchased a WRL variable annuity from
Hutton, for which Hutton received a commission. When he began using Hutton,
Strickler=s
investments totaled approximately $2.5 million. 
Strickler testified that preservation of principal was his primary
objective but, like Graben, his application form listed Agrowth,@ Aaggressive growth,@ and Aincome@ as his top priorities.  Hutton
explained to Strickler that the death benefit aspect of the variable annuity
was a good fit for Strickler as well because it enabled him to guarantee gifts
to support his interests after his death.








As with Graben, Hutton
continued to monitor Strickler=s investments after his initial investment, checking their Morningstar
ratings and risk factors, looking for any change in fund management, and
conferring with Strickler.  At one point,
Strickler suggested that Hutton move his non-WRL annuities into his WRL
annuity, but Hutton advised against such a move.  According to Hutton, although he would have
earned more commissions by making the change, he  advised against it because Strickler would
incur penalties in the process.  Scott
Lenhart, ISI=s Chief
Compliance Officer, testified that Hutton did not take this opportunity to earn
additional commissions upon assuming Graben=s and Strickler=s accounts,
as many brokers would, which was a mark of his integrity.

Like Graben, Strickler
understood that there was a possibility he would lose money in the stock market
and that Hutton had no crystal ball. 
When the market began declining, Strickler, like Graben, asked Hutton
about moving money into cash positions, but Hutton counseled against locking in
his losses and advised Strickler to ride out the bad market.








Strickler informed Hutton
that Strickler did not have education, background, experience, or
sophistication concerning investments and that he was totally dependent upon
Hutton=s counsel and advice.  Hutton=s phone logs show that in May 2002, Strickler informed Hutton that he
wanted to simplify his investment. 
Strickler specifically inquired whether his current allocations were the
best or whether changes needed to be made. 
When Strickler suggested to Hutton that he should go ahead and change
his investments (and incur any attendant penalties) so that he would not
continue to lose so dramatically, Hutton simply advised against it, as he had
with Graben, and the market continued to decline.

During the downturn,
Strickler never ordered Hutton to move his investments out of their equity
positions, nor did he opt to move his investments on his own.  Hutton took over Strickler=s accounts in early 2000 just as the market was peaking and
immediately prior to the market=s beginning its slide, and he held Strickler as a client during the
entire market decline.  Concerning this
decline, Strickler acknowledged that Hutton had Ainherited thisCthis
downturn in the market.@  By July 2003, Strickler had met with Hutton
and informed him that something had to be done because Strickler could not
continue to sustain the continuing losses. 
At this meeting, Hutton told Strickler that he had a new computer
program and a new investment strategy that was totally, diametrically, and
dramatically different than the one he had been using.  Strickler testified that when he and his wife
left the meeting, he realized something was wrong.  In September 2003, Strickler moved his
investments to Hall, who did not change the allocation strategy set by
Hutton.  By December 2004, Strickler=s investments had regained most of their losses, with a total net loss
of $132,739.  Based on a $2.5 million
investment, this loss represented a 5.2% decline over a three-and-a-half year
period, or about a 1.5% decline per year.








In sum, both Strickler and
Graben, collectively the AClients,@ told Hutton from the very beginning that they were dependent on
Hutton for his counsel, experience, and advice, and Hutton admitted that he
knew the Clients were not sophisticated investors.  Hutton also knew that the Clients wanted to
preserve their principal so that they could pass this money along to their
families and acknowledged that the Clients told him that their goal was to Apreserve as much of the principal as they could for posterity.@  Finally, Hutton admitted that
he had a responsibility to determine the appropriate suitability of the Clients= investments.

When soliciting the Clients,
Hutton repeatedly represented himself as a Afinancial advisor.@  However, Hutton did not tell
the Clients that by placing their money into variable annuities, Hutton was
putting the Clients into what was later alleged to be a high-risk, aggressive
investment that was unsuitable for the Clients but that did produce a sizable
$80,000 commission for Hutton. Hutton also purportedly failed to tell the
Clients that by his placing their investment in a variable annuity, Hutton did so
as a Acommissioned broker@ and that a commissioned broker had no further obligation to provide
financial advice to the client after the sale.

According to the Clients, and
unbeknownst to them at the time, Hutton and ISI committed other allegedly
wrongful acts leading to this lawsuit, including the following:








(1)    Hutton misrepresented that he was being paid to monitor Graben=s and
Strickler=s
accounts.

 

(2)    Hutton misrepresented that he was not just monitoring, but was
also Amanaging,@
Graben=s and
Strickler=s
accounts. 

 

(3)    In the context of (1) and (2) above, ISI internal documents
revealed that advertising and representing yourself as a financial advisor,
like Hutton did to Graben and Strickler, can be confusing and misleading.  Hutton knew this.  Hutton=s representation to Graben
and Strickler that he was a financial advisor was a violation of ISI=s
rules.  ISI knew Hutton was representing
himself as a financial advisor even though they knew he was a commissioned
broker.

 

(4)    When soliciting Strickler=s investments, Hutton took
Strickler to the offices of a professional fund/portfolio management company,
which Hutton represented would provide expert management.  This advertising/sales representation by
Hutton directly violated ISI rules.

 

(5)    Hutton admitted that he knew it was critical to Graben and
Strickler that their principal be preserved. 
Yet, on Graben=s and
Strickler=s new
account forms, which Hutton sent to ISI, Hutton did not check the available box
requesting Asafety
of principal.@

 








The Clients filed suit
together on August 29, 2003, alleging that Hutton made misrepresentations, violated
the insurance code, committed negligent acts, and breached a fiduciary
duty.  They also sued ISI for its own
acts and, along with WRL, for vicarious liability for Hutton=s acts.  Asserting that there
was no legal or factual basis for the Clients to join their two separate
lawsuits into one, except as a tactic to prejudice the jury, the Brokers moved
to sever the claims.  The Brokers
contended that the Clients= claims had nothing in common except the same defendants and the same
lawyers.  The trial court refused to
sever and tried the claims jointly.

D.     Trial and Damages








At trial, both sides
presented expert testimony on damages. 
The Clients= expert, Dr.
Scott Hakala, Adisapproved
of@ the advice of all three of the 
Clients= advisorsCMarshall, Hutton, and Hall.  Dr.
Hakala testified that Hutton had placed their money in funds that were too
aggressive and too heavily invested in equities, which was a Arecipe for disaster.@  Dr. Hakala used a damage model
that was based on the performance of two funds that had outperformed the market
from March 2000 until August 2003; he concluded that if Hutton had placed the
Clients in these investments, picked in hindsight according to the Brokers,
Graben should have earned $418,000, and Strickler should have earned $860,600,
including his non-WRL accounts.  However,
Dr. Hakala also testified that he would not have recommended his own damage
model if he were allocating the Clients= funds.  In concluding that
Hutton=s allocations were too aggressive, Dr. Hakala did not research the
actual holdings in the subaccounts of each fund but concluded they were Aaggressive@ by looking
at the names of the funds.  Dr. Hakala
also testified that by placing the Clients in the aggressive-type investments,
Hutton violated the standard of care owed by financial advisors.  The Brokers= experts purportedly looked beneath the fund titles to the subaccounts
and the funds= investment
objectives.  When the Brokers pointed out
to Dr. Hakala that Hall, whom the Clients retained in September 2003, had made
virtually no changes to the investments, Dr. Hakala asserted that Hutton had
waited until the summer of 2003 to move the Clients into a more Amoderate@ position
that Hall then followed, a claim he later admitted was in error.[2]

The Brokers= expert, Karyl Misrack, showed that the Clients= Amoderate@ investment allocation as of summer 2003 had actually been in place
for up to two years under Hutton=s direction.  Misrack further
took issue with Dr. Hakala=s findings, noting that an examination of the actual subaccounts
showed that the funds were more balanced than Dr. Hakala stated because the
fund managers themselves had been relocating the various funds into more
conservative positions as the market fell. 
She opined that the losses were caused entirely by the market decline,
not by Hutton=s and ISI=s actions.








The Brokers also presented
the expert testimony of Bernard Young, a former district director of the
National Association of Securities Dealers (NASD) who had experience in
investigating customer complaints against securities brokers.  He described the NASD=s rule on suitability and testified that Hutton=s investment recommendations for the Clients were suitable.  He also stated that Hutton=s recommendation to stay in the market during a downturn was a widely
accepted strategy, and he described and approved of the manner in which Hutton
monitored the investments.  He explained
how the Morningstar Abeta@ ratings of the Clients= subaccounts indicated that they were far from an Aextremely aggressive@ position.  Like Misrack, he
attributed the decline in the Clients= investments entirely to market forces over which Hutton had no
control.

E.     The Verdict and Judgment








The jury returned a verdict
for the Clients on all claimsCinsurance code violations, negligence,[3]
and breach of fiduciary duty.  The trial
court=s judgment awarded the same amount of actual damages for each of the
insurance code and breach of fiduciary duty causes of action ($104,500 to
Graben and $215,300 to Strickler), as well as disgorgement of commissions for
breach of fiduciary duty ($66,000 to Graben and $14,000 to Strickler) and
prejudgment interest on these amounts.[4]  The judgment also awarded additional damages
for knowing violations of the insurance code in the amount of $75,000 for each
Client against Hutton; exemplary damages in the amount of $2 million to each
Client against ISI, as Hutton=s principal, based on the jury=s finding of fraud; and attorney=s fees in the amount of $219,000 to the Clients jointly.  The trial court also granted the Clients a directed
verdict against WRL and ISI on their respondeat superior claims Afor the acts, omissions, and conduct of Timothy Hutton.@  The trial court denied the
Brokers= post-trial motions, and this appeal followed.

III.  SUFFICIENCY OF THE EVIDENCE

The Clients= three causes of action for which the jury awarded them damages were
their insurance code claims, breach of fiduciary duty claims, and negligence
claims.  Because the Clients did not
elect to recover on the jury=s negligence
findings, the trial court=s final judgment awarded damages for the
Clients= insurance code
claims and breach of fiduciary duty causes of action only.  In their
second issue, the Brokers assert that there is neither legally nor factually
sufficient evidence to support the jury=s findings of liability and damages-enhancing conduct on the part of
Hutton or ISI.  

A.     Standards of Review 








A legal sufficiency challenge may only be sustained when
(1) the record discloses a complete absence of evidence of a vital fact, (2)
the court is barred by rules of law or of evidence from giving weight to the
only evidence offered to prove a vital fact, (3) the evidence offered to prove
a vital fact is no more than a mere scintilla, or (4) the evidence establishes
conclusively the opposite of a vital fact. 
Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex.
1998), cert. denied, 526 U.S. 1040 (1999);
Robert W. Calvert, ANo Evidence@ and AInsufficient
Evidence@ Points of
Error, 38 TEX. L. REV. 361, 362-63 (1960).  In
determining whether there is legally sufficient evidence to support the finding
under review, we must consider evidence favorable to the finding if a
reasonable fact-finder could, and disregard evidence contrary to the finding
unless a reasonable fact-finder could not. 
City of Keller v. Wilson, 168 S.W.3d
802, 827
(Tex. 2005). 

An assertion that the
evidence is factually insufficient to support a fact finding means that the
evidence supporting the finding is so weak or the evidence to the contrary is
so overwhelming that the answer should be set aside and a new trial
ordered.  Garza v. Alviar, 395
S.W.2d 821, 823 (Tex. 1965).  We are
required to consider all of the evidence in the case in making this
determination, not just the evidence that supports the finding.  Mar. Overseas Corp. v. Ellis, 971
S.W.2d 402, 406-07 (Tex.), cert. denied, 525 U.S. 1017 (1998).

B.     Materiality and Causation
of the Clients= Insurance
Code Claims 








In their petition, the
Clients alleged that the Brokers= actions relating to the sale and management of their investments
violated the Texas Insurance Code because the Brokers engaged in unfair and
deceptive acts by making false representations to them.  See Act of April 25, 1957, 55th Leg.,
R.S., ch. 198, ' 1, secs.
3-4, 1957 Tex. Gen. Laws 401, 401-03 (repealed 2003) (current version at Tex. Ins. Code Ann. '' 541.003, .051-.061 (Vernon Supp. 2006)).  They further alleged that they were entitled
to recover for these violations because they had sustained actual damages that
were caused by these misrepresentations.

On appeal, the Brokers claim
that the Clients failed to prove that any allegedly wrongful actions or
representations caused the Clients damage because (1) whether Hutton was a
commissioned broker or a financial advisor was immaterial and did not cause the
Clients damage, (2) an October 23, 2001 letter relied on by the Clients during
trial was also immaterial and did not cause damage, and (3) Hutton performed as
he promised he wouldChe monitored
the Clients= investments
and gave the Clients advice, which they accepted.  Hence, according to the Brokers, the Clients
did not prove that Hutton caused them any damages.   








The Clients respond by
pointing out that Hutton represented to the financially unsophisticated Clients
that he would monitor and manage their accounts;[5]
that he assumed the role of, and acted as, their financial advisor; and that he
failed to comply with ISI=s own
recommendations regarding financial investing by placing them in a virtually
100% stock portfolio that was not diversified into bonds or other
investments.  Further, Hutton admitted
that he was aware of information important to the Clients, such as their
desires to preserve their principal investments and leave inheritances for
their children and grandchildren, when they came to him.  However, evidence relating to the suitability
of investments or any failure on Hutton=s part to meet the Clients= investment requirements is not evidence of and cannot support any
insurance code violation that was submitted because it does not relate to the
types of unfair or deceptive acts that are prohibited by the insurance
code.   








The insurance code violations
were submitted by Jury Question numbers 1 and 2, which inquired as to any Afalse, misleading, or deceptive@ acts or practices defined as (1) misrepresenting the rights or
remedies conferred by an agreement; (2) making, publishing, or disseminating
before the public any advertisement, announcement, or other statement with
respect to the business of insurance that was untrue, deceptive, or misleading;
(3) making an untrue statement of material fact; (4) failing to state a
material fact necessary to make other statements made not misleading; or (5)
making a statement in such a manner as to lead a reasonably prudent person into
a false conclusion of material fact.  

The gravamen of each of the
Clients= claims for insurance code violations was that Hutton and ISI made
misrepresentations.  In contrast, the
allegedly unsuitable recommendations, placement, and handling of the
investments were separate claims covered by separate theories of breach of
fiduciary duty, negligence, and negligent misrepresentation, which were
submitted by separate jury questions. 
Accordingly, we conclude that when the evidence regarding the alleged
violations of the insurance code is properly considered in light of the actual
jury questions and definitions submitted, there is no evidence of any insurance
code violation that caused the Clients any damages.  See Osterberg v. Peca, 12 S.W.3d 31,
55 (Tex. 2000) (holding that sufficiency of evidence must be reviewed in light
of jury charge actually submitted).  

The record is undisputed that
Hutton held licenses as both a commissioned broker and an investment advisor
representative and that he was also authorized to act as a fee-based financial
advisor.[6]  The evidence was, again, undisputed that he
did exactly what he said he would do:  he
monitored the Clients=
investments, provided ongoing investment advice, managed their accounts,
reviewed the accounts, and advised the Clients periodically. 








Hutton admitted that he told
Graben and Strickler he would continue to provide advice and monitor their
accounts.  And the evidence is
overwhelming that he did that.  Graben
and Strickler testified that they relied on Hutton=s advice, and Strickler recalled that they had good rapport.  Hutton testified that he provided ongoing
advice; he understood he had an ongoing responsibility; he held a Asacred trust@; and he
monitored their accounts as an investment advisor. 

Hutton monitored the
investments= subaccounts
by reference to sources such as the Morningstar ratings and review of quarterly
statements.  He made recommendations for
the highest-rated funds and advised the Clients of needed allocation changes in
their accounts.  He utilized several
criteria in choosing funds, including the experience level of the fund managers,
the volatility of the stocks, and the performance level of the funds.  Thus, Hutton=s representations that he was monitoring the accounts were true, not
false statements of any material fact.








Graben and Strickler also
complained that Hutton misrepresented to them that they would never lose their
principal.  But both Clients acknowledged
that they knew they could lose money in the market.  They acknowledged in writing that they knew
they could lose money.  When both Clients
voiced concerns regarding the falling market, Hutton advised them that it would
rise againCas it didCand that they were better off to stay in rather than to Alock in their losses@ at the bottom of the downturn. 
These statements were not misrepresentations of existing fact, nor even
promises of future performance but, at most, merely constituted financial
advice that the Clients accepted.  They
acknowledged that Hutton had no magic wand or crystal ball and could not
predict the market=s
future.  Moreover, the significant
feature of the variable annuity vehicle for their investments was shown to be
the death benefit guaranteeing that the Clients= families would receive the highest value reached by the investments
on an anniversary of the annuity, less withdrawals, even if the actual value
had declined by the time of death.    








The only representation
Hutton made that was shown to be false was his statement in the letter of
October 2001 that he was monitoring the Clients= accounts for a Afee,@ when he was, in fact, not charging them for that ongoing service.  The Clients made much noise about this
misrepresentation.  But it was a
nonissue.  Graben and Strickler had no
complaint about not being charged a fee. 
Graben actually admitted that Hutton had told him he would continue to
monitor his accounts Afor free@ and testified that did not cause him any concern.  Graben also admitted that he did not even
know the difference between a broker and a financial advisor until trial and that
he did not know the technicalities of the compensation.  His concerns were that Hutton should have
placed him in something that was Arock solid@ at his age
and time of life and that Hutton did not do anything to stop the decline in his
investments in the downturn of the market. 
Strickler likewise testified that his grievance was that Hutton did not
do anything when the losses became Adramatic.@

Graben and Strickler did not
contend that any of the claimed misrepresentations by Hutton, nor the approval
of some statements by ISI, caused their damages, and there is no evidence that
they did.  Their real complaint was that
Hutton failed to place or allocate their funds in investments that provided a
suitable allocation of risk for their circumstances.  Their expert, Dr. Hakala, provided no
opinions as to causation of any damages resulting from misrepresentations but
addressed only the issue of the amount of damages that, in his opinion, were
caused by breach of the fiduciary duty Hutton owed as a financial advisor or as
a broker to provide proper financial advice and to place the Clients in
diversified, balanced portfolios with equal proportions of bonds and equities.

We hold that the evidence is
legally insufficient to support the findings in Jury Question numbers 1 and 2
of violations of the insurance code and that the Clients are not entitled to
recover under this theory for their damages. 
This holding dictates that the Clients also are not entitled to recover
additional damages for Aknowing@ violations of the insurance code, attorney=s fees, or prejudgment interest for their insurance code claims.  

C.     Fiduciary Relationship








Having concluded that the
evidence is insufficient to support the jury=s verdict on the Clients= insurance code claims, we now turn to the Brokers= argument that there was insufficient evidence that a fiduciary
relationship existed between Hutton and the Clients, or that if one did exist,
there was insufficient evidence that it was breached.  

1.     Existence of a
Fiduciary Duty

Hutton maintains that there
was no relationship of trust and confidence between himself and the Clients,
that he did not owe them a duty beyond placing orders as instructed and not
making unauthorized trades, and that there was insufficient evidence that even
if a duty did exist, that it was breached by him.  The Clients argue that both a formal and
informal fiduciary relationship existed between Hutton and the Clients.  Specifically, the Clients alleged that Hutton
owed a fiduciary duty based on the formal relationship of principal and agent,
as well as based on an informal relationship of trust and confidence.








As evidence of this fiduciary
relationship, the Clients assert that Hutton himself testified that the
relationship he had with the Clients was a Avery sacred trust@ and that he treated them Abetter than I would treat myself@; that the Brokers= own expert, Bernard Young, testified that Asomeone who represents themself as an investor advisor has a
heightened responsibility to review the account and act as a fiduciary@; that Hutton also owed the Clients a fiduciary duty based on the
formal relationship of principal and agent; and that brokers and financial
advisors owe fiduciary duties.  See
Romano v. Merrill Lynch, Pierce, Fenner & Smith, 834 F.2d 523, 530 (5th
Cir. 1987), cert. denied, 487 U.S. 1205 (1988); Hand v. Dean Witter
Reynolds, Inc., 889 S.W.2d 483, 492 n.5 (Tex. App.CHouston [14th Dist.] 1994, writ denied) (stating that the relationship
between an agent and a principal is a fiduciary one); Robinson v. Merrill Lynch,
Pierce, Fenner & Smith, Inc., 337 F. Supp. 107, 111 (N.D. Ala. 1971), aff=d, 453 F.2d 417 (5th Cir. 1972) (stating
that broker/dealer who also acts as an investment advisor occupies a fiduciary
relationship).  Further, the Clients
assert, and we agree, that the foregoing admissions by Hutton and Young, as
well as ample other evidence, support the jury=s finding that a relationship of trust and confidence existed between
Hutton and the Clients.  








The Brokers rely on Meyer v. Cathey, 167 S.W.3d 327,
331 (Tex. 2005), and Schlumberger Technology Corp. v. Swanson,
959 S.W.2d 171, 176-77 (Tex. 1997), to
argue that for a court to impose a fiduciary or confidential relationship in a
business transaction, the relationship must exist prior to, and apart from, the
agreement made the basis of the lawsuit. 
First, it should be noted that the Brokers did not tender to the trial
court an alternative written instruction containing an instruction to the jury
that a prior and separate relationship is required.  Accordingly, the Brokers failed to preserve
their argument that there must be evidence of a prior and separate
relationship. See Tex. R. Civ. P.
278.








Second, and more importantly,
the holdings in Schlumberger and Meyer are distinguishable.  Schlumberger and Meyer stand
for the proposition that in a true arms=-length business transaction, where one party is denying that it owes
a fiduciary relationship, the court will exercise caution before imposing a
confidential/fiduciary relationship on the parties.  Meyer, 167 S.W.3d at 330-31;
Schlumberger, 959 S.W.2d at 176-77. 
The Texas Supreme Court noted in those cases that A[i]n order to give full force to contracts, we [courts] do not create
such a relationship lightly.@  Meyer, 167 S.W.3d at
331; Schlumberger, 959 S.W.2d at 177. 
Obviously, when a person such as Hutton is acting as a financial
advisor, that role extends well beyond a simple arms=-length business transaction. 
An unsophisticated investor is necessarily entrusting his funds to one
who is representing that he will place the funds in a suitable investment and
manage the funds appropriately for the benefit of his investor/entrustor.  The relationship goes well beyond a
traditional arms=-length
business transaction that provides Amutual benefit@ for both
parties.  In Meyer, the Supreme
Court noted that arms=-length
transactions entered into for the parties= Amutual
benefit@ did not necessarily establish a basis for a fiduciary
relationship.  Meyer, 167 S.W.3d
at 331. 

By Hutton=s own admission, his relationship with the Clients went well beyond
mere Amutual benefit.@  Hutton specifically testified that he told
his clients that he treats them Abetter than [he] would treat [himself].@  Simply put, when Hutton
assumed the role to act as a financial advisor to the Clients and to monitor
and manage their investments, any arms=-length business transaction that may have existed between the parties
was elevated into a fiduciary relationship by the very nature of Hutton=s actions.  See Schlumberger,
959 S.W.2d at 176 (AAn informal
relationship may give rise to a fiduciary duty where one person trusts in and
relies on another, whether the relation is a moral, social, domestic, or purely
personal one.@).  The Brokers= own expert witness agreed, stating that Hutton, as a financial
advisor, had a heightened responsibility to review the Clients= accounts and to act as a fiduciary. Therefore, we reject the Brokers= argument that in this case a fiduciary relationship must exist prior
to, and apart from, the agreement made the basis of this lawsuit.  We hold that the evidence demonstrates the
existence of a fiduciary relationship between Hutton and the Clients.

2.     Breach of the Fiduciary
Duty








Next, the Brokers argue that
even if Hutton did owe a fiduciary duty to the Clients, he did not breach that
duty because his only duty was to execute the trade orders that the Clients
authorized.  See Hand, 889 S.W.2d
at 492 n.5 (stating that the fiduciary duty owed by a stock broker to a
customer is confined to executing the orders that he or she has accepted from
the customer and is Avery narrowCprimarily not to make unauthorized trades@).  Here, though, Hutton was
much more than a mere order-taker to the ClientsChe acted as a financial advisor whom the Clients trusted to monitor
the performance of their investments and recommend appropriate financial plans
to them.  Accordingly, the duty that
Hutton owed the Clients went well beyond the Anarrow@ duty of
executing trade orders.








The Brokers further argue
that the evidence failed to establish a breach of Hutton=s fiduciary duty because there was no evidence that Hutton failed to
put the Clients= interests
above his own or treated the Clients unfairly. However, the jury was charged
that it could also find that Hutton breached his fiduciary duty if he failed to
show that he made reasonable use of the confidence that the Clients placed in
him, that he acted in the utmost good faith and exercised the most scrupulous
honesty toward the Clients, or that he fully and fairly disclosed all important
information to the Clients concerning the transaction.  See Comm.
on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges:
Fiduciary Duty PJC ' 104.2 (2003).  

The testimony of Dr. Hakala,
the Clients= expert
witness, provided evidence that Hutton did not make reasonable use of the
confidence placed in him by the Clients. 
Dr. Hakala testified that the investments that Hutton selected for the
Clients were not appropriate or reasonable because they were too aggressive for
the Clients= needs.  He explained that because the Clients were at
retirement age and needed current income from their investments, almost all
financial advisors would have recommended the Clients= money to be invested more in the bond market rather than in equity
funds due to the reduced risk of loss that bond funds provided.  Instead, Hutton put almost all of the Clients= money into equity stocks and recommended leaving it there even when
the market tumbled, which Dr. Hakala termed Aa recipe for disaster.@








The Brokers contend that
Hutton=s investment recommendations were not unsuitable because the Clients= new broker, Hall, kept essentially the same allocation strategy that
Hutton recommended after the Clients moved their accounts to Hall in 2003.  But Dr. Hakala testified that the investments
were unsuitable from the outset, in 1999 and 2000, when Hutton first
recommended the equity-based variable annuities; thus, even if the new broker
did keep the same allocation strategy in 2003, this action does not necessarily
speak to the suitability of the same allocation strategy under the conditions
of the market three to four years earlier.

The Brokers also complain
about the Clients= failure to
list Asafety of principal@ as one of their priorities and Strickler=s client profile stating his risk tolerance level as Ahigh@ and
defining his objectives as Agrowth,@ Aaggressive growth,@ and Aincome.@  However, Hutton himself
testified that he knew that the Clients wanted to preserve as much of their
principal as possible for posterity and that it was important to the Clients to
preserve the retirement funds for their families.








Anything more than a scintilla of evidence is legally
sufficient to support the jury=s finding that
Hutton breached his fiduciary duty to the Clients.  See Cont=l Coffee Prods.
Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996); Leitch v. Hornsby,
935 S.W.2d 114, 118 (Tex. 1996).  We
conclude that more than a scintilla of evidence exists because the evidence
discussed above furnishes some reasonable basis for differing conclusions by
reasonable minds about the existence of Hutton=s breach of fiduciary
duty.  See Rocor Int=l, Inc. v. Nat=l Union Fire Ins.
Co.,
77 S.W.3d 253, 262 (Tex. 2002). 
Accordingly, we hold that there was legally sufficient evidence to
support the jury=s verdict. 
Furthermore, because the evidence supporting the jury=s finding that
Hutton breached his fiduciary duty is not so weak and
the evidence to the contrary is not so overwhelming that the finding should be
set aside, we also hold that there was factually sufficient evidence to support
the jury=s verdict.  See Garza,
395 S.W.2d at 823. 

 

D.     Fraud

Having concluded that the
evidence is legally and factually sufficient to support the jury=s verdict on the Clients= breach of fiduciary duty claims, we now examine the jury=s finding that Hutton committed fraud while breaching his fiduciary
duty because this fraud finding was the basis of the jury=s $2 million punitive damages award for the Clients.  The Brokers argue that there is not clear and
convincing evidence to support the jury=s finding that Hutton committed fraud. 
The jury was charged with the following definition of Afraud@:

Fraud
occurs when a party makes a material misrepresentation, the misrepresentation
is made with knowledge of its falsity or made recklessly without any knowledge
of the truth and as a positive assertion, the misrepresentation is made with
the intention that it should be acted on by the other party, and the other
party acts in reliance on the misrepresentation and thereby suffers
injury.  

 

Misrepresentation
means a false statement of fact, or a promise of future performance made with
an intent, at the time the promise was made, not to perform as promised, or a
statement of opinion that the maker knows to be false, or an expression of
opinion that is false, made by one claiming or implying to have special
knowledge of the subject matter of the opinion.

 








The gist of fraud is successfully using cunning,
deception, or artifice to cheat another to the other=s injury.  McEwin v. Allstate
Tex. Lloyds, 118 S.W.3d 811, 816 (Tex. App.CAmarillo 2003, no pet.).  In
reviewing the jury=s finding of
fraud by clear and convincing evidence, we must apply a heightened standard of
review and determine whether a reasonable juror could form a firm belief or
conviction that the finding of fraud was true. 
Sw. Bell Tel. Co. v. Garza, 164 S.W.3d 607, 627 (Tex. 2004).  

Here, there was no evidence
that Hutton used cunning, deception, or artifice to cheat the Clients.  Furthermore, while the Clients allude to the
fact that Hutton received a large up-front commission by placing the Clients= money in variable annuities, the Clients failed to show that Hutton
had nefarious motives for investing their money as he did.  Hutton had no financial motive to ignore the
Clients= wishes.  He even gave up the
opportunity to make more commissions by declining to move an investment as
Strickler had suggested because Hutton felt that it was not in Strickler=s best interest.  In sum, the
Clients never articulate why Hutton would have been motivated to place them in
unsuitable investments, much less prove that he acted fraudulently in doing
so.  Accordingly, we hold that there was
legally and factually insufficient evidence of Hutton=s fraud.








Consequently, because the
evidence is insufficient to support the jury=s fraud finding, the punitive damage awards cannot be upheld.  Therefore, the Clients are not entitled to
recover punitive damages from the Brokers for Hutton=s breach of fiduciary duty.

 

 

E.     Sufficiency Holdings

In summary, we hold that
there was legally insufficient evidence of causation to support the Clients= insurance code claims, so we sustain the Brokers= second issue as to the insurance code claims.  We further hold that while there was legally
and factually sufficient evidence of the existence and breach of a fiduciary
duty owed by Hutton to the Clients, there was not clear and convincing evidence
of any fraud committed by Hutton. 
Therefore, we overrule the Brokers= second issue as to the breach of fiduciary duty claims, but we
sustain it as to the punitive damages award. 


IV.  DAMAGE AWARDS








Because we have held that the
jury=s verdict in favor of the Clients on their claims of insurance code
violations and punitive damages is not supported by the evidence, the Clients= only remaining possible recoveries are their breach of fiduciary duty
claims and their negligence claims. 
Assuming, without deciding, that there was sufficient evidence to
support the jury=s verdict
for the Clients on their negligence claims, we now address the Brokers= first issue, in which they assert that the trial court made errors of
law when awarding damages and attorney=s fees, and examine whether the Clients may properly recover on both
their negligence and breach of fiduciary duty causes of action. 

 

A.     One Satisfaction Rule 

The one satisfaction rule
provides that a plaintiff may recover only for the damages suffered as a result
of a particular injury.  Utts v. Short,
81 S.W.3d 822, 833 (Tex. 2002); Foley v. Parlier, 68 S.W.3d 870, 882
(Tex. App.CFort Worth
2002, no pet.).  Here, the Clients
alleged that they suffered only one injury: loss of value to their annuity
contracts.  The jury awarded identical
economic damages for each of the Clients= three theories (insurance code violations, breach of fiduciary duty,
and negligence): $104,500 for Graben and $215,300 for Strickler.  Even though the jury found the Brokers to
have been negligent, the court did not award the Clients anything for their
negligence causes of action in the final judgment.








Under the one satisfaction
rule, a plaintiff must elect a remedy in order to prevent him from obtaining
more than one recovery for the same injury. 
Waite Hill Servs., Inc. v. World Class Metal Works, Inc., 959
S.W.2d 182, 184 (Tex. 1998).  To allow
the Clients to recover under both their breach of fiduciary duty claims and
under their negligence claims would permit an impermissible double
recovery.  Therefore, we hold that the
Clients may recover either under their breach of fiduciary duty claims or under
their negligence claims, but not both. 
Accordingly, we now turn to the Clients= two remaining causes of actionCbreach of fiduciary duty and negligenceCto determine which of these remaining claims presents them with the
greatest possible recovery.

The jury awarded Graben
$104,500 in economic damages for his negligence claim.  Graben was also awarded a total of $170,500
($104,500 in economic damages and $66,000 in profit disgorgement) for his
breach of fiduciary duty claim. 
Therefore, Graben=s greatest
possible recovery lies with his breach of fiduciary duty claim.  As for Strickler, the jury awarded him
$215,300 in economic damages for his negligence claim.  Strickler was also awarded a total of
$229,300 ($215,300 in economic damages and $14,000 in profit disgorgement) for
his breach of fiduciary duty claim. 
Thus, Strickler=s greatest
possible recovery also lies with his breach of fiduciary duty claim.








Accordingly, because the one
satisfaction rule prohibits double recovery, and because the Clients= breach of fiduciary duty causes of action provide the greatest
possible recovery to both Graben and Strickler, we hold that the trial court=s judgment in favor of the Clients on their breach of fiduciary duty
causes of action is proper but that neither Client is entitled to recover on
his negligence claim.[7]  

B.     Award of Attorney=s Fees for Breach of Fiduciary Duty

Having determined that the
Clients may recover only on their breach of fiduciary duty causes of action, we
now turn to the Brokers= complaint
that trial court erred by awarding the Clients attorney=s fees for their breach of fiduciary duty claims.  We agree. 
Attorney=s fees are
not available for a breach of fiduciary duty claim.  Hooks v. Hooks, No. 02-03-00263-CV,
2004 WL 1635838, at *2 (Tex. App.CFort Worth July 22, 2004, no pet.) (mem. op.) (citing Musquiz v.
Marroquin, 124 S.W.3d 906, 913 (Tex. App.CCorpus Christi 2004, pet. denied)). 
Therefore, the trial court erred by awarding the Clients attorney=s fees for their breach of fiduciary duty claims, and we sustain that
portion of the Brokers= first
issue.[8]  








 

 

V.  ASSERTED PROCEDURAL, EVIDENTIARY, AND CHARGE
ERRORS

In their third issue, the
Brokers contend that the trial court committed various procedural and
evidentiary errors and errors in charging the jury, causing the course of trial
to be improperly biased against the Brokers. 
We disagree.

A.     Trial Court=s Refusal to Sever Graben=s and Strickler=s Claims 








The Brokers first assert that
the trial court erred by failing to sever the claims of Graben from those of
Strickler because each client made separate, individual investments that had
nothing to do with the other client=s investment.  The trial court
has broad discretion in the matter of severance and consolidation of causes.  Guar. Fed. Sav. Bank v. Horseshoe Operating
Co., 793 S.W.2d 652, 658 (Tex. 1990); Urdiales v. Concorde Techs. Del.,
Inc., 120 S.W.3d 400, 408 (Tex. App.CHouston [14th Dist.] 2003, pet. denied).  To determine whether a trial court abused its
discretion, we must decide whether the trial court acted without reference to
any guiding rules or principles; in other words, we must decide whether the act
was arbitrary or unreasonable.  Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985), cert.
denied, 476 U.S. 1159 (1986).  The
controlling reasons for a severance are to do justice, avoid prejudice, and
further convenience.  Guar. Fed.,
793 S.W.2d at 658.

According to the Brokers, the
only common factors shared by Graben=s and Strickler=s lawsuits
were their attorney and their complaints against Hutton.  Trying the claims together, the Brokers
argue, effectively turned the trial into a Aclass action for two,@ resulting in the admission of harmful evidence that would never have
been heard in separate trials.  However,
the Brokers never identify what this Aharmful evidence@ is, nor do
they state any legal basis for how this Aharmful evidence@ would have
been excluded in separate trials.  We
hold that under these circumstances, the trial court did not abuse its
discretion by denying the request for severance.  See id.

B.     Trial Court=s
Refusal to Sever Negligent Supervision Claim Against ISI

 








The Brokers next assert error
on the part of the trial court by failing to sever the Clients= negligent supervision claim against ISI because it allowed into
evidence the otherwise irrelevant facts that Hutton was a defendant in three
lawsuits and the subject of four other complaints, along with a March 2004 letter
from the NASD to ISI indicating that Hutton had a number of Areported sales practice disclosure [complaints].@  Even though ISI=s witness explained that these complaints were logged by the NASD
regardless of merit and that the NASD had not determined that Hutton had
committed any violations, the Brokers argued that this evidence was so
prejudicial to Hutton=s defense
that severance was required under rule 404 of the Texas Rules of Evidence,
which prohibits the introduction of evidence related to a person=s character and bad acts.

At trial, however, when
evidence of other complaints against Hutton was offered, the Brokers never
objected to the evidence on the basis of Texas Rule of Evidence 404 regarding Aother crimes, wrongs or acts.@  Tex. R. Evid. 404(b). 
Further, witnesses testified without objection from the Brokers about a
number of other complaints filed against Hutton.  When plaintiffs= exhibit 16 (a complaint against Hutton) was offered, the Brokers did
not object on the basis of rule 404. 
Rather, the Brokers= counsel simply stated that the evidence was Ainadmissible, incomplete, and not consistent with counsel=s representations.@  Finally, when the Clients
offered plaintiff=s exhibit
25, the NASD warning letter regarding Hutton, the Brokers= counsel did not make a rule 404 objection; rather, they simply stated
that the document was Anot relevant
and not probative.@








The complaint on appeal must be the same as that presented
in the trial court.  See Banda
v. Garcia, 955 S.W.2d 270, 272 (Tex. 1997).  Here, the Brokers= rule 404 complaint on appeal was not raised at trial.  Consequently, they have failed to preserve
this alleged error for our review.  See
In re Y.M.A., 111 S.W.3d 790, 792 (Tex. App.CFort Worth 2003, no pet.) (stating rule that legal basis for a
complaint on appeal must be the same as the legal basis upon which the
objection was made at trial).  Moreover,
the Brokers have shown no harmful error even if the evidence were inadmissible.
 See Tex. R. App. P. 44.1.

Second, the evidence of
Hutton=s alleged other wrongful acts was admissible because it was clearly
relevant to the factors that the jury was instructed to consider in question
number 21, the punitive damage assessment question.  The Brokers never requested that the issue of
punitive damages be bifurcated from the liability and actual damages issues at
trial.

Finally, because evidence of
Hutton=s alleged other wrongful acts was relevant to the punitive damage
issues, and even assuming that this were inadmissible under rule 404, the
Brokers were required under Texas Rule of Evidence 105 to obtain a limiting
instruction.  See Tex. R. Evid. 105, 404.  The Brokers did not make such a request.  Consequently, we hold that the trial court
did not abuse its discretion by failing to sever the negligent supervision
claim.  








C.     Trial Court=s Charge Regarding Fiduciary Duty 

The Brokers next assert error
on the part of the trial court by arguing that the trial court=s charge regarding fiduciary duty was tantamount to a directed
verdict.  The standard of review for
alleged jury charge error is abuse of discretion.  Steak & Ale of Tex., Inc. v. Borneman,
62 S.W.3d 898, 905 (Tex. App.CFort Worth 2001, no pet.).  The
trial court instructed the jury that Aa relationship of trust and confidence exists between a financial or
investment advisor and his client.@  Here, the Brokers again cite Schlumberger
to argue that the relationship of trust and confidence must exist prior to,
and apart from, the agreement made the basis of the lawsuit.  Schlumberger, 959 S.W.2d at 171.  We have previously rejected this argument,
and we hold that the trial court did not abuse its discretion by providing this
instruction to the jury.  See Steak
& Ale, 62 S.W.3d at 898. 

D.     Trial Court=s Failure to Charge Jury on Proportionate Responsibility 








Finally, the Brokers argue
that the trial court erred by failing to charge the jury on proportionate
responsibility as among the Brokers and the Clients because the Clients could
have directed Hutton to change their investments but did not.  Presumably, this is some type of negligence
argument.  However, there was no
negligence or other liability cause of action jury question proffered by the
Brokers.  The statutory scheme for determining
the percentage of responsibilityCthat is, the proportionate responsibility findingCcontemplates that before the percentage responsibility question is
submitted, a cause of action liability finding has been made by the jury.  See Tex.
Civ. Prac. & Rem. Code Ann. ' 33.003(a) (Vernon Supp. 2006); see also Romero v. KPH
Consolidation, Inc., 166 S.W.3d 212, 225 (Tex. 2005).  Therefore, the trial court did not fail to
submit a percentage of responsibility question to the jury when the Brokers did
not request that a liability issue be submitted contemporaneously.  We overrule the Brokers= third issue in its entirety.

VI.  CONCLUSION








Because we have held that legally and factually sufficient evidence
exists to support the jury=s verdict in favor of the
Clients on their breach of fiduciary duty claims, we affirm that portion of the
trial court=s
judgment awarding $170,500 to Graben and $229,300 to Strickler in damages and
disgorgement of commissions for their breach of fiduciary duty causes of
action.  We reverse the remainder of the
trial court=s
judgment and render judgment that the Clients take nothing on their insurance
code, negligence and negligent misrepresentation, and attorney=s
fees causes of action, including their demands for Aknowing@
damages under the insurance code, punitive damages,  and attorney=s
fees.  We remand this cause to the trial
court for recalculation of prejudgment interest on the Clients=
breach of fiduciary duty damages award only. 

 

 

BOB MCCOY

JUSTICE

 

PANEL B:   DAUPHINOT, GARDNER, and MCCOY, JJ.

 

DELIVERED:
June 28, 2007

 

 

 











[1]This identification is not meant to
be an implication that these parties are Abrokers@ in the literal financial investment community sense but
rather is used for identification purposes only. 





[2]However, before Strickler moved his
investments, Hutton himself was proposing a change to Strickler=s investment strategy.  Hutton claimed to have a new computer program
in which the investment strategy was Atotally, diametrically, and dramatically different@ than the one Hutton had been
using.





[3]Although the Clients had two
negligence causes of action, negligence and negligent misrepresentation, the
jury awarded only one set of damages for the two causes of action.  For the sake of clarity we will refer
generally to these claims as the Clients= Anegligence@ claims. 





[4]In their brief, the Clients state
that the judgment does not contain an award for the jury=s verdict on their negligence
claims because they did not elect to recover on these claims.





[5]Hutton signed a letter to the
Clients as an Ainvestment advisor representative,@ which in part stated that AI have it [a new computer system]
programmed to help me do a better job of what you ultimately pay me to do,
monitor your investments and keep you posted on any changes or recommendations
to your financial plan.@ 






[6]Hutton held series
6, 7, and 65 licenses from NASD. 





[7]The
Brokers argue under their second issue that the Clients=
insurance code and negligence claims are barred under the applicable two-year
statutes of limitation.  Tex. Ins. Code Ann. '
541.162 (Vernon Supp. 2006); Tex. Civ.
Prac. & Rem. Code Ann. ' 16.003(a) (Vernon Supp.
2006).  Because we have held that there
was legally insufficient evidence to uphold the insurance code claims and that
the Clients=
negligence claims do not present their greatest possible recovery, we need not
address this argument. See Tex. R. App. P. 47.1.





[8]The remainder of the Brokers= first issue challenges the
propriety of the trial court=s punitive damages award, double recovery to the Clients on
their insurance code and breach of fiduciary duty claims, and award for Aknowing@ violations of the insurance
code.  Because we have held that the
evidence is insufficient to support the trial court=s judgment on the Clients= insurance code and punitive
damages claims, we need not address these remaining arguments.  See Tex.
R. App. P. 47.1.